**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Park Avenue North LLC, | No. CV-21-01508-PHX-SPL |
| Plaintiff, | |
| vs. | **ORDER** |
| Travelers Casualty Insurance Company of America, | |
| Defendant. | |

Before the Court are Defendant's Motion for Summary Judgment (Doc. 96), Defendant's Separate Statement of Facts in Support of Motion for Summary Judgment (Doc. 97), Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's Liability for Breach of Contract (Doc. 98), and Plaintiff's Statement of Material Facts in Support of its Motion for Partial Summary Judgment (Doc. 99). The Motions have been fully briefed and are ready for consideration.[1] (Docs. 102, 103, 104, 105, 108, 109). The Court rules as follow.

**I.   BACKGROUND**

On May 31, 2019, Plaintiff's commercial property located at 212, 228, and 242 South Park Avenue, Tucson, Arizona 85719 (the "Property") was substantially damaged by a fire. (Doc. 1-3 at ¶¶ 5, 8). At the time of the fire, the Property was insured by

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Defendant. (Doc. 1-3 at ¶¶ 6–7). The Businessowners Policy (the "Policy") provided replacement cost coverage for damage to the Property for up to $1,346,498. (Doc. 96 at 2; Doc. 96-3 at 6). The Policy provides in part that:

> **4. Loss Payment – Building and Personal Property**
>
> **e.** We will determine the value of Covered Property in the event of covered loss or damage as follows:
>
> **(1)** At replacement cost (without deduction for depreciation), except as provided in Paragraphs (2) through (18) below.
>
> **(a)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.
>
> **(b)** We will not pay on a replacement cost basis for any loss or damage:
> **(i)** Until the lost or damage property is actually repaired or replaced; and
> **(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.
>
> **(c)** We will not pay more for loss or damage on a replacement cost basis than the least of Paragraph (i), (ii) or (iii) subject to Paragraph (d) below:
> **(i)** The Limit of Insurance applicable to the lost or damaged property:
> **(ii)** The cost to replace the lost damaged property with other property:
> **a)** Of comparable material and quality; and
> **b)** Used for the same purpose; or
> **(iii)** The amount actually spent that is necessary to repair or replace the lost or damaged property.
>
> If a building is rebuilt at a new premises, the cost described in Paragraph **(ii)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

> **(d)** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

(Doc. 96-3 at 108).

Under the Policy, Plaintiff was entitled to collect the actual cash value ("ACV") of the covered damages prior to starting any repairs to the Property, and the replacement cost value ("RCV") after the repairs were completed. (Doc. 96-3 at 107–08).

After Plaintiff reported the fire loss, Defendant accepted coverage and began investigating the extent of the damage. (Doc. 96 at 4; Doc. 102 at 3). Defendant hired a structural engineer and a building consultant to assist with identifying the scope and cost of repairs. (*Id.*). On June 10, 2019, Defendant's claims adjuster and consultants conducted a site inspection and negotiated the scope of the necessary repairs with Plaintiff's public adjuster and general contractor. (*Id.*). This initial inspection occurred prior to the removal of any fire damage debris and any material demolition to the Property. (Doc. 102 at 3). On July 29, 2019, Defendant issued Plaintiff a payment of $315,647.43 which represented the undisputed ACV of the damage to the Property. (Doc. 1-3 at ¶ 17; Doc. 96-9).

Thereafter, upon receiving additional information about the cost of repairs, Defendant revised the RCV and the ACV three times.[2] (Doc. 96 at 4). On September 12, 2019, Defendant estimated the RCV at $678,018.51, and the ACV at $396,803.59. (Doc. 96-6 at 20). On September 30, 2019, Defendant estimated the RCV at $636,438.51, and the ACV at $445,959.07. (Doc. 96-7 at 20). On October 31, 2019, Defendant issued Plaintiff a final estimate that included a proposed plan for reconstruction, and it estimated the RCV at $638,014.38 and the ACV at $447,534.94. (Doc. 96-8 at 20). Plaintiff's general contractor, however, agreed to reconstruct the property in accordance with Travelers' September 12, 2019 estimate for $678,018.51. (Doc. 96 at 5; Doc. 96-12). As of October

---

[2] The repair estimates define the RCV as the estimated cost of repairing or replacing an item with a similar one. (Docs. 96-6, 96-7, 96-8). The ACV is defined as the estimated value of the damage at the time of the loss. (*Id.*). The ACV is calculated by subtracting the depreciation from the RCV. (*Id.*).

3

31, 2019, Defendant paid Plaintiff a total of $446,534.94 which represented the total ACV less Plaintiff's $1,000 deductible. (Doc. 96 at 5).

After removing debris and completing initial demolition work, Plaintiff's general contractor "discovered that additional work would be needed to complete the repairs described in [Defendant's] estimate." (Doc. 102 at 3–4). So, on August 9, 2020, Plaintiff's contractor gathered photographs of the work underway and prepared a supplemental estimate listing additional repairs that totaled to $286,540.94 (the "August Supplement"). (Doc. 96 at 5; Doc. 102 at 3–4). On September 25, 2020, Defendant rejected most of the items listed in the August Supplement because those items reflected a method of construction that differed from the photographs. (Doc. 96 at 8). Defendant determined that the bulk of the work described in the August Supplement was not necessary and concluded that the RCV was $681,516.62 and the ACV was $484,661.86. (Doc. 108 at 3; Doc. 96-16). Thus, Defendant issued Plaintiff an additional payment of only $37,126.92 to cover the additional undisputed ACV costs. (*Id.*).

Ultimately, Plaintiff disagreed with Defendant's method for reconstructing the Property and completed the repairs following its general contractor's method of construction. (Doc. 102 at 4–5). On October 12, 2020, after the repairs were completed, Plaintiff's contractor prepared another supplemental estimate showing that it would cost an additional $227,614.60 (the "October Supplement") to complete the repairs at the Property. (Doc. 102 at 4). Defendant, however, rejected the October Supplement in its entirety and concluded that "[it] was identical to the August [Supplement] and was nothing more than a hypothetical estimate for work that was not necessary and never actually done." (Doc. 96 at 7). In total, Plaintiff claims that the cost to complete all the necessary repairs totaled to $924,361.22. (Doc. 102 at 4). Defendant disputes that Plaintiff paid this amount and argues that Plaintiff paid its contractor no more than $674,944.02. (Doc. 96 at 8; Doc. 96-20).

On October 20, 2020, Plaintiff's public adjuster provided Defendant with a copy of the October Supplement to collect the depreciation holdback. (Doc. 96 at 7–8; Doc. 102 at

4–5). On November 9, 2020, Defendant paid Plaintiff for the undisputed depreciation holdback but declined to pay any additional costs. (Doc. 96 at 8). The total RCV paid to Plaintiff for the claim was $691,643.02. (Doc. 96 at 8).

On February 2, 2021, Plaintiff invoked the appraisal provision of the Policy to resolve the parties' dispute about value of the loss. (Doc. 102 at 5). In response, on February 22, 2021, Defendant requested that Plaintiff provide information regarding the amount expended on the completed repairs to confirm whether there was a dispute. (Doc. 96 at 8). On February 23, 2021, Plaintiff moved forward with the appraisal process unilaterally without providing the requested information. (*Id.*). On March 1, 2021, Defendant made a second request for Plaintiff to show whether the cost of repairs exceeded the payments Defendant had already paid. (*Id.*). Plaintiff claims that Defendant breached the Policy by failing to participate in the appraisal process. (Doc. 102 at 5–6).

On May 28, 2021, Plaintiff initiated this action against Defendant in Maricopa County Superior Court. (Doc. 1-3). On July 30, 2021, Plaintiff filed the operative First Amended Complaint alleging claims for breach of insurance contract, breach of implied duty of good faith and fair dealing, and tortious bad faith claims handling. (*Id.*). On September 2, 2021, Defendant removed the case to this Court. (Doc. 1).

On August 29, 2023, Defendant filed its Motion for Summary Judgment. (Doc. 96). On August 30, 2023, filed its Motion for Partial Summary Judgment. (Doc. 98). The motions have been fully briefed.

**II.   LEGAL STANDARD**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy its burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id*. When

considering a motion for summary judgment, a court must view the factual record and draw all reasonable inferences in a light most favorable to the nonmoving party. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). When parties file cross-motions for summary judgment, the court must review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences. *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1118 (9th Cir. 2018).

## III. DISCUSSION

Plaintiff and Defendant move for summary judgment with respect to Plaintiff's claim that Defendant failed to adhere to the terms of the Policy. (Docs. 96, 98). Plaintiff seeks partial summary judgment and asks the Court to find as a matter of law that Defendant is liable for breaching the appraisal provision of the Policy. (Doc. 98). In turn, Defendant maintains that it complied with all provisions of the Policy and moves to dismiss each of Plaintiff's claims. (Doc. 96). The Court will address each issue individually.

### A. Breach of Insurance Contract

Both parties move for summary judgment on the merits of Plaintiff's breach of contract claims. The parties agree that Arizona law governs the breach of contract claims. "To state a cause of action for breach of contract, the Plaintiff must plead facts alleging (1) a contract exists between the plaintiff and defendant; (2) the defendant breached the contract; and (3) the breach resulted in damage to plaintiff." *Little v. Grand Canyon Univ.*, 516 F. Supp. 3d 958, 964 (D. Ariz. 2021) (internal citations omitted). It is undisputed that a contract exists, therefore, the dispositive issues are whether Defendant committed a breach that would entitle Plaintiff to damages.

#### i. Failure to Pay Full Benefits of the Policy

Plaintiff alleges that Defendant breached the Policy by "fail[ing] to make payments properly owed under the Policy." (Doc. 1-3 at ¶ 41). To allege a breach due to underpayment in an insurance contract claim, Plaintiff must provide "evidence from which a trier of fact could find that [it] incurred repair costs above the payment [it] received." *See Bond v. Am. Fam. Mut. Ins. Co.*, No. CV-06-1249-PHX-DGC, 2008 WL 477873, at *2 (D.

Ariz. Feb. 19, 2008). Here, Defendant argues that "[t]o date, there has been *no evidence* produced that Park Avenue spent more to repair the Property than the amount Travelers paid." (Doc. 96 at 13 (emphasis added)). But the parties openly dispute whether the October Supplement can be used as evidence to show that Plaintiff's claim was underpaid. Defendant claims that the October Supplement "represents the cost of a hypothetical repair methodology that was never utilized to repair the Property." (Doc. 96 at 13). Whereas Plaintiff argues that Defendant "accepted the [October Supplement] in the amount of $924,361.22 as proof of the amount paid or owed by Plaintiff for the repairs to the [P]roperty." (Doc. 102 at 5). Plaintiff further argues that it informed Defendant that the October Supplement was the invoice for the total costs incurred and because Defendant refused to pay the total invoice Plaintiff owes its general contractor the remaining balance. (Doc. 103 at 14; Doc. 103-7 at 2; Doc. 103-5 at 16). Therefore, Plaintiff has presented some evidence to show that it incurred additional costs, and Defendant's assertion that "[i]t is undisputed that the [October Supplement] does not represent the amount actually incurred for repairs" is false. (Doc. 96 at 13). Undoubtably, there is a genuine dispute regarding whether Plaintiff incurred costs that exceeded the payments it received from Defendant. *See Craten v. Foster Poultry Farms Inc.*, 305 F. Supp. 3d 1051, 1054 (D. Ariz. 2018) ("A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence."). Accordingly, whether Defendant breached the Policy by failing to pay Plaintiff its full benefit under the Policy is a question of fact for the jury to decide.

### ii. *Failure to Submit to Appraisal*

Plaintiff argues that it is entitled to summary judgment as a matter of law because it is undisputed that Defendant failed to participate in the appraisal process. (Doc. 98 at 7–8). However, Defendant argues that it did not have to proceed with Plaintiff's demand for appraisal because Plaintiff did not have a right to invoke the appraisal provision. (Doc. 104 at 8–10). Whether Defendant had an obligation to submit to Plaintiff's appraisal request is a question of contract interpretation. "[T]he interpretation of a contract is a matter of law,

and a contract must be construed so that every part is given effect." *SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 308 (D. Ariz. 2022). Arizona courts "construe provisions in [insurance] contracts according to their plain and ordinary meaning." *First Am. Title Ins. Co. v. Johnson Bank*, 372 P.3d 292, 294 (Ariz. 2016). "If a policy is subject to conflicting reasonable interpretations, it is ambiguous . . . ." *Teufel v. Am. Fam. Mutual Ins. Co.*, 419 P.3d 546, 548 (Ariz. 2018) (internal quotation marks omitted). To resolve an ambiguity, courts first "look[ ] to legislative goals, social policy, and the transaction as a whole." *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008). "If an ambiguity remains, we construe it against the insurer . . . ." *Teufel*, 419 P.3d at 548.

The Court interprets the contract by reading it as a whole, *see Tech. Constr., Inc. v. City of Kingman*, 278 P.3d 906, 911 (Ariz. Ct. App. 2012), but the appraisal provision in the Policy is particularly relevant in this case. The "Appraisal" provision states in relevant part:

> If we and you disagree on the value of the property, the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property, the amount of Net Income and operating expense or the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>
> **a.** Pay its chosen appraiser; and
> **b.** Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

(Doc. 96-3 at 106). Reading the contract as a whole, the Court finds that it unambiguously provides that Plaintiff is entitled to make a written request for an appraisal of the loss if the parties disagree on the amount of the loss.

Defendant contends that Plaintiff had no right to invoke the Appraisal provision because the parties did not disagree as to the amount of the loss and Plaintiff failed to submit documentation showing a disagreement. (Doc. 104 at 9–10). But, according to the briefings, the parties disagreed on whether the repairs listed in the August and October supplemental estimates were necessary to restore the property. (Doc. 96 at 7, 11–12; Doc. 102 at 3–5). So, in other words, the parties disagreed as to the amount of the loss because the supplemental estimates increased the overall cost of the claim. Defendant also argues that because Plaintiff has not paid its contractor the full invoice price there is no disagreement as to the amount of the loss. (Doc. 108 at 6). This argument fails—Plaintiff claims that it still owes its contractor an outstanding balance. (Doc. 102 at 6). Thus, pursuant to the terms of the Policy, Plaintiff was entitled to request an appraisal.

The Court also rejects Defendant's argument that it was precluded from "fairly inspecting and evaluating" the additional damages because Plaintiff waited to invoke the Appraisal provision until after the repair work was already completed. (Doc. 104 at 10). In its briefing, Defendant admitted that "aside from some credits for certain line items, the October [Supplement] was identical to the August [Supplement]." So, Defendant had an opportunity to inspect and evaluate the additional work prior to the completion of repairs when it received the August Supplement. Defendant violated the terms of the Policy by failing to participate in the appraisal process. Accordingly, for the reasons discussed, the Court finds that as a matter of law, Defendant is liable for breaching the Appraisal provision of the Policy.

  B. <u>Insurance Bad Faith Claim Handling and Implied Duty of Good Faith and Fair Dealing</u>

Under Arizona law, "there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort." *Noble v. Nat. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981) (*en banc*). To establish a bad faith claim, "'a[n insured] must show the absence of a reasonable basis for denying benefits of the policy and the [insurer's] knowledge or

reckless disregard of the lack of a reasonable basis for denying the claim.'" *Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1267–68 (Ariz. 1992) (*en banc*) (quoting *Noble*, 624 P.2d at 866); *Creasman v. Farmers Cas. Ins. Co.*, No. CV-22-01820-PHX-DJH, 2023 WL 4533964, at *9 (D. Ariz. July 13, 2023) ("The tort of bad faith only arises when an insurance company intentionally denies or fails to process or pay a claim without a reasonable basis for such action.") (citation omitted).

This test turns on whether the insurer acted reasonable under the circumstances and treated its insureds fairly in evaluating their claims. *Deese*, 838 P.2d at 1268 (citations omitted). "Although the initial inquiry consists of an objective finding, i.e., whether the insurer acted unreasonably, the second inquiry focuses on the insurer's conduct and whether the insurer *knew* that its conduct was unreasonable or acted with such reckless disregard that such knowledge could be imputed to it." *Id.* (citing *Rawlings v. Apodaca*, 726 P.2d 565, 573 (Ariz. 1986) (*en banc*)).

Defendant argues that Plaintiff's bad faith claims do not survive summary judgment because Defendant reasonably investigated the loss and timely paid Plaintiff for all the costs that it incurred. (Doc. 96 at 14). But, as previously discussed, whether Plaintiff incurred additional costs for covered damages is a genuine dispute of material fact. The parties also dispute whether it was unreasonable for Defendant to request additional information prior to submitting to Plaintiff's demand for appraisal. Thus, Defendant is not entitled to summary judgment respect to these claims because there are genuine disputes of material facts that remain.

  C. <u>Punitive Damages</u>

Defendant argues that it is entitled to summary judgment as to Plaintiff's punitive damages claim because there is no clear and convincing evidence to show that Defendant acted with an evil mind. "Summary judgment dismissing a punitive damages claim is appropriate in the absence of facts sufficient to show by clear and convincing evidence that the defendant acted with the requisite evil mind." *Purdy as Tr. of Survivors of Jones v. Metcalf in & for Cnty. of Pima*, 502 P.3d 36, 40 (Ariz. Ct. App. 2021) (quoting *SWC*

*Baseline & Crismon Invs., L.L.C. v. Augusta Ranch Ltd. P'ship*, 265 P.3d 1070 (Ariz. Ct. App. 2011). "In a bad faith tort case against an insurance company, punitive damages may only be awarded if the evidence reflects 'something more' than the conduct necessary to establish the tort." *Holy Trinity Greek Orthodox Church v. Church Mut. Ins. Co.*, 476 F. Supp. 2d 1135, 1140 (D. Ariz. 2007) (citation omitted). The Arizona Supreme Court has explained that the requisite of "something more" or "evil mind" is established by producing evidence to show that the defendant either: (1) intentionally caused an injury; (2) committed a wrongful conduct motivated by spite or ill will; or (3) acted to serve its own interests and knowingly and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others, even though defendant had neither desire nor motive to injure. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313 (Ariz. 1988).

Without more, Plaintiff alleges that Defendant is liable for punitive damages because of its conduct in handling the claim and appraisal demand. (Doc. 102 at 16). As previously discussed, Defendant violated the Policy by refusing to participate in the appraisal process because it believed that Plaintiff did not have a right to invoke the Appraisal provision. It is worth noting, however, that "Plaintiff [must] advance facts additional to those supporting a finding of [] bad faith to prove that [Defendant's] conduct was willful and knowing, such as evidence of deliberate, overt and dishonest dealings." *See Holy Trinity*, 476 F. Supp. 2d at 1141. But Plaintiff has failed to provide any additional facts to support its punitive damages claim. Instead, it makes an idle statement alluding to an unknown issue of fact that entitles it to punitive damages against Defendant. (Doc. 102 at 16). Because Plaintiff has not presented clear and convincing evidence to show that Defendant acted with an evil mind, Plaintiff's claim for punitive damages fails. *See Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 682 (Ariz. 1986) ("If it had been shown that there was a deliberate ignoring of the [the plaintiff's] rights and needs, then punitive damages might have been awardable.").

///

///

## IV. CONCLUSION

In sum, the Court finds that, as a matter of law, Defendant breached the Policy by failing to participate in the appraisal process. Additionally, the Court grants Defendant's Motion with respect to Plaintiff's punitive damages claim. But the remaining claims must be resolved at trial by a finder of fact, therefore, Defendant's Motion is denied with respect to the remaining claims. Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 98) is **granted**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 96) is **granted in part and denied in part**.

Dated this 12th day of March, 2024.

Honorable Steven P. Logan
United States District Judge